# Exhibit A

BAJA FRESH WESTLAKE VILLAGE, INC. LEASE

THIS LEASE is made as of this 12th day of Sept, 2003, by and between General Hancock Limited Partnership, a Pennsylvania limited partnership ("Landlord"), and Baja Fresh Westlake Village, Inc., a California corporation ("Tenant").

1.    FUNDAMENTAL LEASE PROVISIONS

1.1    In General. This Article 1 is an integral part of this Lease and all of the terms, dates and requirements set forth in this Article 1 are incorporated in this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following terms, whenever used in this Lease, shall have the meanings set forth in this Article 1.

1.2    "Premises" and "Property." The real property, as legally described on Exhibit A.

Store Address: 110 Garden Golf Boulevard, Montgomeryville, PA 18936

1.3    Term.

| | |
|---|---|
| Initial Term: | 15 years |
| Option Terms: | Two (2) additional five (5) year periods. |
| Scheduled Delivery Date: | Upon the mutual execution and delivery of the Lease |

1.4    Base Rent.

| | |
|---|---|
| Years 1 through 5: | Ninety Thousand Dollars ($90,000) Per Year; provided, however that Base Rent for the first four (4) months of the Term shall be reduced by Five Thousand Dollars ($5,000) per month, so that the Base Rent for each of the first four (4) months shall be Two Thousand Five Hundred Dollars ($2,500) per month. |

Subject to adjustment as set forth in Section 4.2 of this Lease.

1.5    [Intentionally Deleted]

1.6     [Intentionally Deleted]

1.7     [Intentionally Deleted]

1.8     Addresses For Notices.

To Landlord:

Mr. Clay Heckler
General Hancock Limited Partnership
2312 North Broad Street
Colmar, PA 18915
Phone: 215-822-1830 x 317
Fax: 215-822-0502
Email: select-properties@comcast.net

With a copy to:

Merle R. Ochrach
Hamberg, Rubin, Mullin, Maxwell &
Lupin
375 Morris Road
P.O. Box 1479
Lansdale, PA 19446-0773

To Tenant:

Baja Fresh Westlake Village, Inc.
100 Moody Court, Suite 200
Thousand Oaks, CA 91360
Attn: Real Estate

1.9     Shopping Center. The Premises and the other buildings and property, as shown on Exhibit F.

## 2.     PREMISES AND LANDLORD'S WORK

2.1     Premises. Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Premises, in consideration of, and upon the terms and conditions contained in this Lease.

2.2     Landlord's Work. Landlord shall, at Landlord's sole cost and expense, perform work on the Premises in accordance with Landlord's Work under the provisions of Exhibits C and C-1 ("Landlord's Work").

2.3     Delay in Landlord's Work. If Landlord has not completed Landlord's Work in accordance with Exhibits C and C-1 and delivered possession of the Premises to Tenant prior to the Scheduled Delivery Date (subject only to minor Punch List items), then Tenant may, at its option, accept possession of the Premises on the Scheduled Delivery Date and complete the incomplete portions of Landlord's Work, and charge Landlord for the reasonable cost thereof. If Landlord does not pay such amount within thirty (30) days after notice from Tenant, then Tenant may deduct such amount from Base Rent hereunder.

R:\Client Files\Baja Fresh\Montgomeryville, PA\lease 7.doc          2

If the Premises are not completed and delivered to Tenant in the condition required hereunder prior to the date that is three (3) months after the Scheduled Delivery Date, then Tenant may terminate this Lease.

3.    TERM

3.1    Initial Term. The Initial Term of this Lease shall be of the duration set forth in Article 1 hereof and shall commence on the earlier of the following dates in (a) or (b) below, ("Commencement Date"), and shall terminate on the last day of the month in which the 15th anniversary of the Commencement Date occurs, unless extended or sooner terminated as set forth in this Lease:

(a)    The date on which Tenant opens for business in the Premises; or

(b)    The date which is one hundred twenty (120) days after the later to occur of the date that (i) Landlord has provided Tenant with a fully executed copy of the Lease; (ii) Tenant has received Landlord's approval of Tenant's plans (if such approval is required under the Lease); (iii) Tenant has received all permits or approvals required for Tenant's construction or conduct of Tenant's business in the Premises so long as Tenant pursues acquisition thereof with due diligence; and (iv) Landlord has delivered possession of the Premises to Tenant in the condition required hereunder (except for the Landlord's completion of the retaining wall for the parking lot, which Landlord shall complete within 30 days after the Commencement Date). In no event, however, shall Tenant be required to accept possession of the Premises prior to the Scheduled Delivery Date.

3.2    Option Terms. So long as Tenant is not in default past the applicable cure period either at the time of exercise of an Option Term or at the beginning of the Option Term, Tenant is hereby granted two (2) options to extend the Initial Term of this Lease as set forth in Article 1 hereof, by giving to Landlord written notice of its exercise of each such option at least one hundred eighty (180) days before the expiration of the Initial Term, or prior Option Term, as the case may be. The Option Terms shall be upon the same terms, covenants, conditions, provisions and agreements applicable to the Initial Term, except that Tenant shall pay to Landlord the Base Rent during such Option Terms as set forth in Article 1 under Option Term Rent.

4.    RENTAL

4.1    Types of Rental. Tenant covenants and agrees to pay to Landlord as rental for the use and occupancy of the Premises, at the times and in the manner hereinafter provided, to the address of Landlord set forth in Section 1.8, the following sums:

(a)    Base Rent as set forth in Article 1 hereof, payable in twelve (12) equal monthly installments, in advance, on the first day of each calendar month during each year of the term of the Lease. If the Commencement Date of the term hereof occurs on a day other than the first day of the month, the monthly installment of Base

Rent for the fraction of the month starting with the Commencement Date shall be prorated on the basis of the actual number of days in such month; and

     (b)    Additional Rent as set forth in Section 12.3 of this Lease.

    4.2    <u>Base Rent Adjustment</u>. Effective as of the first day of the sixtieth (60th) month of the Lease, and every 60th month anniversary thereafter (inclusive of Option Terms) (each, a "CPI Adjustment Date"), the Base Rent shall be increased to equal the sum of (i) the Base Rent payable during the first Lease Year, as set forth in Section 1.4 hereof), plus (ii) the product obtained by multiplying such Base Rent by the percentage increase in the "Consumer Price Index" (as defined below) measured from the last month for which the Consumer Price Index is published immediately preceding the Rent Commencement Date to the last month for which the Consumer Price Index is published immediately preceding the CPI Adjustment Date in question. Notwithstanding the foregoing, in no event shall the Base Rent after any CPI Adjustment Date be greater than the Base Rent for the month immediately preceding such CPI Adjustment Date plus ten percent (10%) of such amount. If the comparison Consumer Price Index required for the calculation specified herein is not available on the CPI Adjustment Date in question, Tenant shall continue to pay the amount of Base Rent payable during the period immediately preceding the CPI Adjustment Date in question until the Consumer Price Index is available and the necessary calculation is made. As soon as such calculation is made, Tenant shall immediately pay to Landlord the amount of the under-payment (if any) of Base Rent for the month or months that may have elapsed pending the calculation of the Base Rent for the CPI Adjustment Date in question. As used in this Lease, the term "Consumer Price Index" shall be deemed to mean the Consumer Price Index for All Urban Consumers for the same metropolitan area in which the Premises is located, as published by the United States Department of Labor, Bureau of Labor Statistics, or any successor index thereto. The first Lease Year shall extend from the Commencement Date of the Lease to the first December 31. The second Lease Year shall commence on the first January 1 to occur following the Commencement Date of this Lease and terminate the following December 31. Thereafter, each Lease Year shall coincide with the calendar year. The final Lease Year period shall terminate on the termination date of the Lease, if other than December 31.

    4.3    <u>Lease Year Defined</u>. The first Lease Year shall extend from the Commencement Date of the Lease to the first December 31. The second Lease Year shall commence on the first January 1 to occur following the Commencement Date of this Lease and terminate the following December 31. Thereafter, each Lease Year shall coincide with the calendar year. The final Lease Year period shall terminate on the termination date of the Lease, if other than December 31.

5.    USE OF PREMISES

    5.1    <u>Use</u>. The Premises may be occupied and used solely for the purpose of conducting the business of a Mexican style restaurant for the preparation and sale for consumption on-premises and/or off-premises of food and beverages (including

alcoholic beverages for on-premises consumption) and for no other purpose without Landlord's prior written consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, Tenant shall be entitled to modify the use of the Premises if such modification is consistent with the operation of a first-class restaurant and does not conflict with any written exclusive use clause in favor of another tenant in the Shopping Center as of such modification. Tenant may use a loudspeaker at reasonable decibel levels to announce orders in the Premises and the Patio Area, and to play music in such areas (but such loudspeaker shall be audible only in the Premises and Patio Area and such loudspeaker use must be in accordance with all applicable local, Federal and State laws). Tenant, and its agents, employees and customers shall have the non-exclusive right to use all portions of the Common Area.

5.2    Exclusive Use. Landlord and Tenant agree that no part of the Shopping Center (other than the Premises) shall be used for a primary use which is the preparation and/or sale of Mexican style foods.

5.3    Operations. Notwithstanding anything contained to the contrary in this Lease, Tenant shall have no obligation to continuously operate its business in the Premises, or to operate during any particular hours. Notwithstanding the foregoing, if Tenant shall fail to open for business or to operate and conduct its business for a period of one hundred eighty (180) consecutive days or more (except for temporary closures for remodeling, repairs, maintenance, and where the closure is due to casualty, condemnation, or force majeure), Landlord may, at its option, declare this Lease terminated in which case the rights and obligations of the parties shall be as though the Lease had terminated at the end of the term hereof.

6.    REPAIR AND MAINTENANCE

6.1    Tenant's Responsibility. Tenant shall, at its sole cost and expense, maintain all parts of the Premises, in a first-class condition, reasonable wear and tear and damage by casualty excepted. Tenant shall also maintain all wiring, plumbing, pipes, conduits and other utilities which are located in and exclusively service the Premises. Notwithstanding anything contained to the contrary herein, in no event shall Tenant have any obligation to repair any damage or defects caused by the acts or omissions of Landlord or its agents or contractors. If Tenant fails to undertake to repair or maintain the Premises as required pursuant to this Lease after thirty (30) days notice to Tenant (or such longer period as is reasonably required for such repair or maintenance), then Landlord may, at its option, perform such repairs or maintenance and charge Tenant for the reasonable cost thereof.

6.2    [Intentionally Deleted].

6.3    Tenant Alterations. Tenant may make non-structural alterations or improvements to the interior of the Premises, in a good and workmanlike manner, and in conformity with all laws, ordinances and regulations of public authorities having jurisdiction over the Premises, without Landlord's prior consent but upon providing fifteen (15) days prior written notice to Landlord. Tenant shall not make any alterations

to the structural or exterior portions of the Premises without first obtaining the written consent of Landlord, which shall not be unreasonably withheld.

6.4    Tenant's Liens. Prior to commencement of any work upon the Premises, Tenant shall cause to be filed a proper Waiver of Mechanics Lien with the Prothonotary of the Court of Common Pleas of Montgomery County, PA. Tenant shall pay or cause to be paid prior to delinquency all costs for work done by it or caused to be done by it on the Premises and Tenant will keep the Premises free and clear of all mechanics' liens and other liens on account of work done by or for Tenant relating thereto. Tenant shall hold Landlord harmless from and indemnify and defend Landlord against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) on work performed for or materials or supplies furnished to Tenant, which relate to the Premises. If Tenant shall desire to contest any claim of lien, it shall furnish Landlord reasonable security of the value or amount of the lien, plus estimated costs and interest. If a final judgment establishing the validity or existence of a lien for any amount is entered by any court of competent jurisdiction, Tenant shall pay and satisfy the same at once.

6.5    Landlord's Liens. Landlord shall keep the Premises free and clear of all mechanics' liens and other liens on account of work done by or for Landlord relating thereto. Landlord shall hold Tenant harmless from and indemnify and defend Tenant against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorney's fees) on work performed for or materials or supplies furnished to Landlord, which relate to the Premises.

7.    INSURANCE

7.1    Tenant's Insurance. During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance. Any insurance policy required of Tenant may be maintained by means of a polic~ ~~ ~olicies of blanket insurance, covering additional items or locations, and                            ~rov~~~ f~~ ~~~h . deductible limits as Tenant deems reason                                              also be primary, excess and/or umbrella insur~

(a)    Liability Insurance. E damage insurance insuring against claims for bodily injury, personal injury or property damage arising out of or in connection with Tenant's use upon, in or about the Premises in a limit of not less than Three Million Dollars ($3,000,000.00) for injury to or death of one person in any one accident or occurrence and in an amount of not less than Three Million Dollars ($3,000,000.00) for injury to or death of more than one person in any one accident or occurrence. Tenant's insurance shall be primary with respect to claims arising out of events occurring in the Premises.

(b)    Property Insurance. Commercial property form insurance to the extent of the replacement value of Tenant's fixtures, equipment and inventory in the Premises, as well as commercial property form insurance insuring the Premises against damage and destruction by fire, vandalism, and other perils in the amount of eighty

to the structural or exterior portions of the Premises without first obtaining the written consent of Landlord, which shall not be unreasonably withheld.

6.4    Tenant's Liens. Prior to commencement of any work upon the Premises, Tenant shall cause to be filed a proper Waiver of Mechanics Lien with the Prothonotary of the Court of Common Pleas of Montgomery County, PA. Tenant shall pay or cause to be paid prior to delinquency all costs for work done by it or caused to be done by it on the Premises and Tenant will keep the Premises free and clear of all mechanics' liens and other liens on account of work done by or for Tenant relating thereto. Tenant shall hold Landlord harmless from and indemnify and defend Landlord against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) on work performed for or materials or supplies furnished to Tenant, which relate to the Premises. If Tenant shall desire to contest any claim of lien, it shall furnish Landlord reasonable security of the value or amount of the lien, plus estimated costs and interest. If a final judgment establishing the validity or existence of a lien for any amount is entered by any court of competent jurisdiction, Tenant shall pay and satisfy the same at once.

6.5    Landlord's Liens. Landlord shall keep the Premises free and clear of all mechanics' liens and other liens on account of work done by or for Landlord relating thereto. Landlord shall hold Tenant harmless from and indemnify and defend Tenant against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorney's fees) on work performed for or materials or supplies furnished to Landlord, which relate to the Premises.

7.    INSURANCE

7.1    Tenant's Insurance. During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance. Any insurance policy required of Tenant may be maintained by means of a policy or policies of blanket insurance, covering additional items or locations, and any such policy may provide for such deductible limits as Tenant deems reasonably appropriate. Such insurance may also be primary, excess and/or umbrella insurance.

(a)    Liability Insurance. Bodily injury, personal injury and property damage insurance insuring against claims for bodily injury, personal injury or property damage arising out of or in connection with Tenant's use upon, in or about the Premises in a limit of not less than Three Million Dollars ($3,000,000.00) for injury to or death of one person in any one accident or occurrence and in an amount of not less than Three Million Dollars ($3,000,000.00) for injury to or death of more than one person in any one accident or occurrence. Tenant's insurance shall be primary with respect to claims arising out of events occurring in the Premises.

(b)    Property Insurance. Commercial property form insurance to the extent of the replacement value of Tenant's fixtures, equipment and inventory in the Premises, as well as commercial property form insurance insuring the Premises against damage and destruction by fire, vandalism, and other perils in the amount of eighty

percent (80%) of the full replacement value of the Premises, as such value may exist from time to time. Tenant may self-insure plate glass.

7.2    [Intentionally Deleted]

7.3.    Evidence of Insurance; Standards. Tenant agrees to deliver to Landlord certificates of insurance evidencing the existence in force of the policies of insurance described in this Article 7 upon the written request of Landlord. All of the policies of insurance required to be maintained hereunder shall be issued by an insurer licensed to do business within the state in which the Premises are located, which insurer is rated "A-" or better in Best's Insurance Reports and which certificate shall provide that such insurance shall not be canceled or materially amended unless thirty (30) days' prior written notice of such cancellation or amendment is given to the other party.

7.4    Mutual Waiver of Subrogation. Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease. Landlord and Tenant shall require their respective insurance companies to include a standard waiver of subrogation provision in their respective policies.

7.5    Tenant Indemnity. Tenant shall defend, indemnify, and hold Landlord and Landlord's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) by or on behalf of any person, entity, or governmental authority occasioned by or arising out of (a) injuries occurring in the Premises; (b) any intentional act, or negligence of Tenant or Tenant's agents, employees, or independent contractors; (c) any breach or default in the performance of any obligation on Tenant's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Tenant herein to be true when made. This indemnity does not extend to the intentional or negligent acts or omissions of Landlord or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of the Lease.

7.6    Landlord Indemnity. Landlord shall defend, indemnify, and hold Tenant and Tenant's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) by or on behalf of any person, entity, or governmental authority occasioned by or arising out of (a) injuries occurring in the Common Areas or any other portion of the Shopping Center outside the Premises; (b) any intentional act, or negligence of Landlord or Landlord's agents, employees, or independent contractors;

R:\Client Files\Baja Fresh\Montgomeryville, PA\lease 7.doc            7

(c) any breach or default in the performance of any obligation on Landlord's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Landlord herein to be true when made. This indemnity does not extend to the intentional or negligent acts or omissions of Tenant or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of the Lease.

8.    HAZARDOUS MATERIALS

8.1    Definitions. As used herein, the term "Hazardous Materials" means any chemical, substance, material, object, condition or waste, or combination thereof, which (a) is defined as a hazardous substance, hazardous material, hazardous waste, pollutant, toxic material or contaminant under any Environmental Law, (b) is a petroleum hydrocarbon, including crude oil or any fraction thereof, (c) may be hazardous to human health or safety of the environment due to its harmful or potentially harmful properties or effects, including, toxicity, corrosivity, flammability, explosivity, infectiousness, radioactivity, carcinogenicity or reproductive toxicity, (d) is regulated pursuant to any Environmental Law, and/or (d) is asbestos or asbestos-containing material ("ACM"). As used herein, the term "Environmental Law" means any federal, state or local environmental, health and/or safety related law, regulation, standard, court decision, ordinance, rule, code, judicial or administrative order or decree, directive, guideline, permit or permit condition relating to Hazardous Material.

8.2    Landlord Representation. To the best of Landlord's knowledge, except as set forth in the Environmental Report (defined below), no Hazardous Material has been used, generated, manufactured, produced, stored, released, discharged or disposed of on, under or about the Premises or the Shopping Center (or off-site of the Premises that might affect the Premises) or transported to or from the Premises or the Shopping Center (or off-site of the Premises that might affect the Premises) by any entity, firm or person, or from any source whatsoever. Landlord has provided Tenant with a copy of a Phase I Environmental Site Assessment relating to the Property, dated November 2001 ("Environmental Report").

8.3    Landlord Remediation. Notwithstanding any other provision in this Lease, in the event that any investigation, removal, remediation, clean-up or other action in connection with Hazardous Materials is required by any Environmental Law applicable to the Premises or the Shopping Center, during the term of this Lease, Landlord shall be responsible for promptly performing such required investigation, removal, remediation, clean-up or other action at Landlord's sole expense in accordance with applicable Environmental Laws; provided, however, that if and to the extent such Hazardous Material was deposited by Tenant or Tenant's agents, employees, or contractors, then Tenant shall be responsible to reimburse Landlord for all reasonable costs incurred in such investigation, removal, remediation, and clean-up. Landlord agrees to remove at Landlord's sole cost any and all ACM prior to the delivery of the Premises by Landlord, and such removal shall be deemed to be a part of Landlord's Work. If any ACM is discovered in the Premises during Tenant's construction, Landlord

shall remove same and the Commencement Date shall be delayed one day for each day of delay caused thereby.

8.4   Tenant Remediation. In the event that any investigation, removal, remediation, clean-up or other action in connection with Hazardous Materials in the Premises that were deposited by Tenant or Tenant's agents, employees or contractors is required by any Environmental Law during the term of this Lease, Tenant shall be responsible for promptly performing such required investigation, removal, remediation, clean-up or other action at Tenant's sole expense in accordance with applicable Environmental Laws. Tenant shall not violate any Environmental Laws regarding Tenant's use of Hazardous Materials. Tenant shall not bring any Hazardous Materials on the Premises except in compliance with all applicable Environmental Laws.

8.5   Tenant Reimbursement. Tenant hereby agrees to reimburse Landlord for all reasonable costs (including, without limitation, attorneys' fees) which arise out of the presence of any Hazardous Materials deposited by Tenant in, on, under or about the Premises or the Shopping Center. This reimbursement provision shall survive termination of this Lease.

8.6   Landlord Indemnity. Landlord hereby agrees to indemnify, defend and hold harmless Tenant, its officers, directors, employees, agents and each of their respective successors and their assigns from and against any and all losses, damages, claims, judgments, liabilities, fines, penalties, fees, costs and expenses (including, without limitation, attorneys' fees) which arise out of the presence or suspected presence of any Hazardous Materials brought onto the Premises or Shopping Center by Landlord, or Landlord's agents, employees, or contractors. This indemnity shall survive termination of this Lease.

9.   DAMAGE AND DESTRUCTION

9.1   Termination of Lease. Notwithstanding anything to the contrary contained in this Lease, in the event of damage or destruction to the Premises, Tenant and Landlord shall each have the right to terminate this Lease under the following conditions: (a) the damage is such that the Premises cannot be restored within one hundred eighty (180) days from the date of damage; (b) the damage or destruction is caused by a peril not required to be insured against hereunder; or (c) the damage or destruction occurs during the last two (2) years of the Initial Term (or any Option Term), the cost of repair exceeds fifty thousand dollars ($50,000) and Tenant has not previously exercised any option rights it may have for the succeeding Option Term.

9.2   Restoration and Rent Abatement. If this Lease is not terminated, Landlord shall repair and restore the Premises, as the case may be, within 180 days, and this Lease shall continue; provided, however, that commencing on the date of the damage or destruction and continuing until repair or restoration is substantially complete and Tenant is open for the business upon the Premises, all rental hereunder shall be proportionately abated or reduced, based on the extent to which Tenant's use

of the Premises or essential services to the Premises or the Common Areas is impaired.

## 10. TAXES

10.1 Taxes Defined. Taxes means all general real estate taxes and other taxes and assessments levied against the Premises by any authority having the power to tax such interest in the real property; provided, however, that Taxes shall not include: (a) any interest, penalty or surcharge of any kind if Tenant has timely paid Taxes as set forth herein, (b) any increase in real estate taxes caused by a change in ownership of all or any portion of the Premises, any mortgaging or refinancing of the Premises, improvements for other tenants, during the Initial Term and Option Terms, and (c) any tax which may be levied upon the Landlord or any personal property taxes, franchise, inheritance or estate taxes which may be levied against the estate or interest of Landlord. All assessments shall be paid by Landlord over the maximum period allowed under applicable law, and Tenant shall be liable for the minimum payment thereof.

10.2 Payment. For each Lease Year, Landlord shall provide Tenant with a copy of the tax statement and Tenant shall pay the Taxes for the Premises directly to the taxing authority prior to delinquency, provided that the invoice or statement is received at least thirty (30) days prior to such date. Tenant shall have the right to challenge, at its sole expense, the Taxes and Landlord agrees to provide whatever assistance Tenant may reasonably require. Should Tenant be in occupancy during only a portion of the first or final tax year, Tenant shall be responsible to Landlord for Taxes based on the portion of such tax year included in the term of this Lease.

10.3 Tenant's Personal Property Taxes. Tenant shall pay, prior to delinquency, any and all personal property taxes levied against Tenant's leasehold improvements, fixtures, equipment, furniture and other personal property located within the Premises.

10.4 Rebates. Any rebates, refunds, reductions, or abatements of Taxes received by Landlord subsequent to payment of taxes by Tenant and applicable to the Term shall be refunded to Tenant on a pro-rata basis within twenty (20) days of receipt thereof by Landlord.

## 11. UTILITIES

Tenant shall pay for all water, tele[...] used by Tenant during the Term in the Pr[...] metered to the Premises at Tenant's sole [...] responsible for the utility connection fees f[...] Premises, which are estimated to be Thirty-Nine Thousand One Hundred Dollars ($39,100). Such fee reflects payment for five (5) equivalent dwelling units. If Tenant utilizes more than 1500 gallons of water per day, the municipality may require Landlord to purchase additional sewer EDUs, and Tenant shall reimburse Landlord for such cost. Tenant shall pay for such EDUs at the time of signing this Lease; provided, however, that if Tenant terminates this Lease as permitted under Section 17, then Landlord shall

of the Premises or essential services to the Premises or the Common Areas is impaired.

## 10.    TAXES

10.1    Taxes Defined. Taxes means all general real estate taxes and other taxes and assessments levied against the Premises by any authority having the power to tax such interest in the real property; provided, however, that Taxes shall not include: (a) any interest, penalty or surcharge of any kind if Tenant has timely paid Taxes as set forth herein, (b) any increase in real estate taxes caused by a change in ownership of all or any portion of the Premises, any mortgaging or refinancing of the Premises, improvements for other tenants, during the Initial Term and Option Terms, and (c) any tax which may be levied upon the Landlord or any personal property taxes, franchise, inheritance or estate taxes which may be levied against the estate or interest of Landlord. All assessments shall be paid by Landlord over the maximum period allowed under applicable law, and Tenant shall be liable for the minimum payment thereof.

10.2    Payment. For each Lease Year, Landlord shall provide Tenant with a copy of the tax statement and Tenant shall pay the Taxes for the Premises directly to the taxing authority prior to delinquency, provided that the invoice or statement is received at least thirty (30) days prior to such date. Tenant shall have the right to challenge, at its sole expense, the Taxes and Landlord agrees to provide whatever assistance Tenant may reasonably require. Should Tenant be in occupancy during only a portion of the first or final tax year, Tenant shall be responsible to Landlord for Taxes based on the portion of such tax year included in the term of this Lease.

10.3    Tenant's Personal Property Taxes. Tenant shall pay, prior to delinquency, any and all personal property taxes levied against Tenant's leasehold improvements, fixtures, equipment, furniture and other personal property located within the Premises.

10.4    Rebates. Any rebates, refunds, reductions, or abatements of Taxes received by Landlord subsequent to payment of taxes by Tenant and applicable to the Term shall be refunded to Tenant on a pro-rata basis within twenty (20) days of receipt thereof by Landlord.

## 11.    UTILITIES

Tenant shall pay for all water, telephone, gas, electricity and all other utilities used by Tenant during the Term in the Premises, all of which shall be separately metered to the Premises at Tenant's sole cost and expense. Tenant shall be responsible for the utility connection fees for all utilities exclusively serving the Premises, which are estimated to be Thirty-Nine Thousand One Hundred Dollars ($39,100). Such fee reflects payment for five (5) equivalent dwelling units. If Tenant utilizes more than 1500 gallons of water per day, the municipality may require Landlord to purchase additional sewer EDUs, and Tenant shall reimburse Landlord for such cost. Tenant shall pay for such EDUs at the time of signing this Lease; provided, however, that if Tenant terminates this Lease as permitted under Section 17, then Landlord shall

promptly return such payment to Tenant. If sprinklers are required to be installed in the Premises, Tenant shall reimburse Landlord for the six thousand dollars ($6,000) that Landlord has already paid for the fire service fee. Landlord agrees that, as of the Commencement Date, the Premises shall have readily available to it water, telephone, gas, electricity and all other utilities, all sufficient to adequately care for Tenant's needs, but in no event of less capacity than as may be specified in Exhibits C and C-1 or as may be required by law or regulation, and such utility connections shall be provided to the rear of the Premises in a location established by Landlord and Tenant. Landlord shall bear all costs for installation of utility lines to the Premises, including hook-up fees. Landlord represents that there are gas lines which Tenant may connect to obtain at least 2 million BTU's consistently and nothing prevents Tenant from tapping in to such source.

## 12. COMMON AREAS

12.1 "Common Areas" Defined. "Common Areas" means all parking areas, landscaping, sidewalks and other areas and facilities on the Shopping Center intended for the common use of the occupants of the Shopping Center and their agents, employees and customers.

12.2 [Intentionally Deleted]

12.3 Additional Rent. Tenant shall pay to Landlord, an amount equal to two thousand dollars ($2000) per year for the Landlord's maintenance of the boule‑ on the Shopping Center (collectively called "Ad‑‑‑‑ onal Rent shall be payable on or before the first ( A P Term hereof, and on the first day of each an⏐ ⏐ g the Term. Tenant's Additional Rent for a per⏐ ⏐ month s...a.. __ paid by Tenant on a per diem basis based on a thirty... -, uay month. Effective as of the first day of the sixtieth (60th) month of the Lease, and every 60th month anniversary thereafter (inclusive of Option Terms), the Additional Rent shall increase by ten percent (10%).

12.4 [Intentionally Deleted]

12.5 [Intentionally Deleted]

12.6 [Intentionally Deleted]

12.7 [Intentionally Deleted]

## 13. ASSIGNMENT AND SUBLETTING

Tenant may assign this Lease, or sublet all or a portion of the Premises, with Landlord's consent, which shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to assign this Lease or sublease all or a portion of the Premises to an entity that: (a) controls, is controlled by, or is under common control with Tenant (each is an

promptly return such payment to Tenant. If sprinklers are required to be installed in the Premises, Tenant shall reimburse Landlord for the six thousand dollars ($6,000) that Landlord has already paid for the fire service fee. Landlord agrees that, as of the Commencement Date, the Premises shall have readily available to it water, telephone, gas, electricity and all other utilities, all sufficient to adequately care for Tenant's needs, but in no event of less capacity than as may be specified in Exhibits C and C-1 or as may be required by law or regulation, and such utility connections shall be provided to the rear of the Premises in a location established by Landlord and Tenant. Landlord shall bear all costs for installation of utility lines to the Premises, including hook-up fees. Landlord represents that there are gas lines which Tenant may connect to obtain at least 2 million BTU's consistently and nothing prevents Tenant from tapping in to such source.

12.    COMMON AREAS

12.1    "Common Areas" Defined.    "Common Areas" means all parking areas, landscaping, sidewalks and other areas and facilities on the Shopping Center intended for the common use of the occupants of the Shopping Center and their agents, employees and customers.

12.2    [Intentionally Deleted]

12.3    Additional Rent.    Tenant shall pay to Landlord, an amount equal to two thousand dollars ($2000) per year for the Landlord's maintenance of the boulevard on the Shopping Center (collectively called "Additional Rent"). Tenant's share of Additional Rent shall be payable on or before the first day of the first full calendar month of the Term hereof, and on the first day of each and every successive calendar month during the Term. Tenant's Additional Rent for a period less than one month shall be paid by Tenant on a per diem basis based on a thirty (30) day month. Effective as of the first day of the sixtieth (60th) month of the Lease, and every 60th month anniversary thereafter (inclusive of Option Terms), the Additional Rent shall increase by ten percent (10%).

12.4    [Intentionally Deleted]

12.5    [Intentionally Deleted]

12.6    [Intentionally Deleted]

12.7    [Intentionally Deleted]

13.    ASSIGNMENT AND SUBLETTING

Tenant may assign this Lease, or sublet all or a portion of the Premises, with Landlord's consent, which shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to assign this Lease or sublease all or a portion of the Premises to an entity that: (a) controls, is controlled by, or is under common control with Tenant (each is an

R:\Client Files\Baja Fresh\Montgomeryville, PA\lease 7.doc          11

"Affiliate"); (b) arises as a result of a consolidation, merger, government action, or other reorganization with Tenant and/or Tenant's Affiliate; (c) owns or acquires all or substantially all of the assets of Tenant and/or Tenant's Affiliate; (d) is an authorized franchisee or licensee of Tenant, and/or Tenant's Affiliate, and/or the Tenant's franchisor; or (e) acquires Tenant's leasehold interest, provided such entity engages in a lawful retail or restaurant use that is not in conflict with any existing written exclusive use clause of another tenant in the Shopping Center (each of the foregoing is a "Permitted Transfer" and each such assignee or sublessee is a "Permitted Transferee"). Further notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to sublet approximately 1200 square feet of floor area of the building on the Premises to a sublessee for a retail or services use, so long as such use does not conflict with any existing written exclusive use clause of another tenant in the Shopping Center, and such sublet shall be a "Permitted Transfer" for purposes of this Lease. Landlord shall not be entitled to any consideration in connection with any assignment of the Lease or sublet of the Premises; provided, however, that Tenant shall reimburse Landlord for Landlord's reasonable costs and fees (up to $1,000) in connection with an assignment or sublet by Tenant (other than a Permitted Transfer); provided, however that if the Base Rent received by Tenant from a sublessee exceeds one hundred and thirty-three percent (133%) of the Base Rent provided under this Lease, then Landlord shall be entitled to forty percent (40%) of the rental in excess of 133% of the Base Rent provided under this Lease, that is received by Tenant from a sublessee. For purposes of this Section, "excess rental" shall mean that all the excess rental payable to Tenant by any sublessee that exceeds the rental payable under the Lease less (i) Tenant's reasonable leasing commissions; and (ii) payment attributable to the amortization of the cost of Tenant improvements made to the Premises and Tenant's cost. Excess rental shall not include any consideration received by Tenant in connection with a Permitted Transfer. Tenant shall remain secondarily liable under this Lease following any assignment or subletting, and shall not be relieved of its responsibilities and obligations under the Lease unless the assignee or sublessee, in the reasonable judgment of Landlord, has the financial capability of assuming Tenant's responsibilities and obligations under the Lease. For the purpose of this Lease, any sale or transfer of Tenant's capital stock through any public exchange, or redemption or issuance of additional stock of any class shall not be deemed an assignment, subletting or any other transfer of the Lease or the Premises.

14.    DEFAULT

    14.1    Tenant Default.

        (a)    The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

        (i)    The failure by Tenant to make any payment of Base Rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of ten (10) business days after Landlord notifies Tenant in writing of such failure; provided, however, that in no event shall Landlord be required to provide such notice to Tenant more than two (2) times per calendar year; or

(ii)     The failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than the payment of sums due hereunder, where such failure shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within such thirty (30) day period and thereafter diligently pursues such cure to completion.

Notwithstanding any other provision hereof, Landlord shall reasonably mitigate any damages incurred as a result of Tenant's default hereunder.

(b)     Notwithstanding the foregoing or anything in the Lease to the contrary, in the event that Tenant has assigned this Lease or sublet the Premises to a franchisee or licensee of Tenant or Tenant's Affiliate, Tenant (or Tenant's franchisor) may cure any default by such franchisee or licensee and Landlord agrees to accept the performance of Tenant (or Tenant's franchisor) of such obligation provided such default is cured within the cure periods specified in this Lease. In the event that such franchisee or licensee is in default of its franchise agreement, Tenant (or Tenant's franchisor) shall, without Landlord's consent, have the right to become the "Tenant" under the Lease subject to the following terms and conditions:  (a) Tenant (or Tenant's franchisor) accepts an assignment of the Lease or sublease of the Premises back from the franchisee or licensee, (b) Tenant (or Tenant's franchisor) immediately satisfies (within the time periods set forth in this Lease) all outstanding rental obligations and cures all defaults existing under this Lease as of the date of such transfer, and (c) Tenant (or Tenant's franchisor) provides Landlord with a written indemnity agreement in a form reasonably acceptable to Landlord, agreeing to pay for, defend (with an attorney reasonably approved by Landlord), indemnify, and save Landlord harmless against and from any real or alleged damage or injury and from all claims, judgments, liabilities, costs and expenses, including attorneys' fees and costs, arising out of or connected with any claim by such franchisee or licensee that Tenant (or Tenant's franchisor) does not have any rights to take possession of the Premises or to an assignment of the Lease.

(c)     If Tenant is in default under this Lease past the applicable cure period, then Landlord may declare the entire remaining unpaid Base Rent for the balance of the Initial Term of this Lease, minus the fair market value of the rental for the Premises for the balance of the Initial Term of this Lease, to be immediately due and payable, at a discount rate of the prime rate.

14.2   Landlord Default. If Landlord should be in default in the performance of any of its obligations under this Lease, which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default, or if such default is of a nature to require more than thirty (30) days for remedy and continues beyond the time reasonably necessary to cure (unless Landlord has undertaken procedures to cure the default within such thirty (30) day period and diligently pursues such efforts to cure to completion), Tenant may, at its option:

R:\Client Files\Baja Fresh\Montgomeryville, PA\lease 7.doc          13

(a) incur any expenses necessary to perform the obligation of Landlord specified in such notice and charge Landlord for the reasonable cost thereof, (b) seek money damages, or (c) pursue the remedy of specific performance, in addition to any other remedies Tenant may have hereunder or at law or in equity.

## 15.   EMINENT DOMAIN

15.1   If the Premises or any portion thereof are taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power (all of which is herein referred to as "condemnation"), this Lease shall terminate as to the part so taken as of the earliest of the following occur:  (i) twenty (20) days after Tenant gives notice to Landlord of its election to vacate following the date the condemnor gives a notice of intention to take or the condemning authority takes title to the Premises or the portion thereof, or (ii) the date the condemning authority takes possession of the Premises or the portion thereof.  The party who receives the condemnor's notice of intention to take shall immediately give written notice of such receipt to the other party. If more than twenty-five percent (25%) of the Premises or the Property, is taken by condemnation, or if the effect of condemnation is to render the Premises insufficient for Tenant's use in its reasonable business judgment, either Landlord or Tenant may terminate this Lease at any time after the condemning authority gives notice in writing of such election within twenty (20) days after the giving of notice of the taking or, in the absence of such notice, then within twenty (20) days after the condemning authority shall have taken possession.  Notwithstanding the foregoing, a "condemnation" shall not include the taking by PennDOT of all or any portion of the grassy side yard area of the Premises in connection with the current redesign of the highway system by PennDOT, so long as such taking does not impact Tenant's parking, access, or site lines.

15.2   If this Lease is not terminated by either Landlord or Tenant, then it shall remain in full force and effect as to the portion of the Premises remaining, provided the Base Rent shall be reduced in the same proportion that the area taken bears to the total area of the Premises prior to taking.  If this Lease is not terminated, then Landlord agrees, at Landlord's sole cost, to restore the Premises as soon as reasonably possible to a complete unit of like quality, character and utility for Tenant's purposes as existed prior to the condemnation.  Notwithstanding anything contained herein to the contrary, if the Premises are not repaired and restored within one hundred and eighty (180) days from the date of the condemnation, then Tenant may cancel the Lease at any time after the one hundred and eightieth (180th) day and before the two hundred and tenth (210th) day following the date of condemnation.  Nothing contained herein shall be deemed or construed to prevent Landlord or Tenant from enforcing and prosecuting a claim or claims for the value of its respective interest or rights in connection with any condemnation proceedings, whether partial or complete

## 16.   SIGNAGE

Tenant, at its cost, shall have the right to install or place signs, awnings, or other advertising materials in or about the Premises to the maximum extent permitted by law;

provided that Tenant obtains Landlord's consent (which shall not be unreasonably withheld): (a) as to the method of attaching signs that will be permanently attached to the exterior of the building in which the Premises is a part; and (b) for the location and design of any pylon signs. Tenant shall have the right, at its own expense, to maintain within the interior of the Premises any signs and advertising materials customary or appropriate in the conduct of Tenant's business. Landlord hereby approves Tenant's exterior building sign or signs as set forth in Exhibit D. Landlord shall not allow any signage other than Tenant's to be placed on the exterior walls of the Premises.

17.    PERMIT CONTINGENCY.    *including the pole/pylon sign to be located not more than 30 feet from 309, to include Tenant's standard channel letters and exposed neon, subject to code.*

Tenant's obligations under this Lease are conditioned on Tenant's obtaining, by July 31, 2003, any permits and/or licenses (including but not limited to conditional use permits, building permits and variances) that are required by applicable laws to enable Tenant legally (a) to construct Tenant's improvements to the Premises in accordance with its plans; (b) to install Tenant's signage on the Premises; and (c) to conduct its business from the Premises. Tenant shall, at Tenant's expense, initiate and diligently pursue each permit and/or license. Landlord shall execute any applications and shall provide Tenant with such further assistance and cooperation as Tenant may require in connection with applications for such permits and/or licenses. If Tenant does not obtain such permits and/or licenses on terms satisfactory to Tenant by such time frame, Tenant shall have the right to terminate this Lease. Thereafter, neither party shall have any rights or liabilities under the Lease. Tenant shall vacate the Premises within thirty (30) days after exercising the option to terminate as herein provided.

18.    TENANT'S PATIO AREA.

If such seating is permitted by the local authorities, Tenant may provide outdoor seating exclusively for its customers on the Property adjacent to the Premises, as shown by cross-hatching on Exhibit E, at any time during the Term of this Lease at no additional rental. Such outdoor seating area is called the "Patio Area." Tenant acknowledges that a special exception may be required from the applicable township zoning hearing board in connection with Tenant's Patio Area. Tenant, at its cost, shall comply with all relevant state provincial, municipal or local laws, regulations, rules or ordinances with respect to Tenant's operations conducted on the Patio Area, and obtain all necessary permits and/or licenses for the same. Tenant shall clean the Patio Area exclusively serving its customers, and keep it in a reasonably clean and neat fashion. Tenant's Patio Area must accommodate approximately 30 seats. Tenant may place its standard patio furnishings thereon including permanently installed gas heaters. Tenant shall pour a level concrete area for such Patio Area at Tenant's cost. Landlord represents that there are no underlying documents or restrictions of any kind that will now or in the future preclude Tenant from maintaining tables and chairs outdoors adjacent to the Premises for its Patio Area. Landlord shall not do anything by way of act or omission that indirectly or directly negatively impacts Tenant's ability to use the Patio Area.

R:\Client Files\Baja Fresh\Montgomeryville, PA\lease 7.doc          15

19.   TRASH.

Tenant may place on the Premises trash containers and recycling bins for trash disposal and recycling exclusively for Tenant's use, as well as an oil recycling barrel. Tenant may contract for trash disposal and recycling pick-up at Tenant's cost.

20.   TITLE OF LANDLORD

To the best of Landlord's knowledge, Landlord represents and warrants that it is the fee owner of the Premises and the Shopping Center, and that Landlord has full right and lawful authority to enter into and perform Landlord's obligations under this Lease; that Landlord has good marketable title to the Premises and the Shopping Center, free and clear of any matters of record and/or any governmental regulations including, without limitation, use limitations, zoning codes or ordinances, which prevent the Premises and the Property from being used as set forth in this Lease. Further, Landlord represents and warrants that there are no, and in the future Landlord shall not voluntarily permit, physical or legal conditions and/or impediments affecting the Premises that would now, or in the future, have the effect of: (a) disrupting, impairing or prohibiting, in any way, Tenant's intended use of the Premises, (b) increasing Tenant's obligations under the Lease, or (c) decreasing Tenant's rights hereunder.

21.   SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT

Tenant shall, upon Landlord's request, subordinate this Lease to any mortgage or deed of trust placed by Landlord upon the Premises or the Shopping Center; provided, that such mortgage or deed of trust, by its terms or by separate written agreement with Tenant, provides that if Tenant is not then in default under this Lease past the applicable cure period, this Lease shall not terminate as a result of the foreclosure of such mortgage or deed of trust, and Tenant's rights under this Lease shall continue in full force and effect and Tenant's possession of the Premises shall be undisturbed except in accordance with the provisions of this Lease. Tenant will, upon request of the holder of the mortgage or deed of trust, be a party to such an agreement, if such agreement does not materially alter or modify this Lease, and will agree that if such holder of the mortgage or deed of trust succeeds to the interest of Landlord, Tenant will attorn to such holder of the mortgage or deed of trust (or successor-in-interest of the holder of the mortgage or deed of trust) as its landlord under the terms of this Lease.

22.   PARKING

Landlord shall provide all parking needed to meet all code and permitting requirements at no expense to Tenant. In no event shall Landlord reduce the number of parking spaces currently on the Property. Landlord shall not materially vary or permit to be materially varied the existing means of ingress and egress to the Property. Without limiting the foregoing, Landlord shall not reduce the number of parking spaces below that which is required by law for Tenant to maintain its permit to use and occupy the Premises. Tenant is entitled to all parking spaces on the Property and may identify

R:\Client Files\Baja Fresh\Montgomeryville, PA\lease 7.doc          16